# COURT OF APPEALS OF VIRGINIA

**Record No. 0842-25-3**

ANDREW RALPH FOKAS, JR.

v.

COMMONWEALTH OF VIRGINIA

Present: Judges Causey, Raphael and Duffan

Opinion Issued July 21, 2026[*]

**FROM THE CIRCUIT COURT OF FRANKLIN COUNTY**
Timothy W. Allen, Judge

(William Edward Cooley), for appellant.

(Jay Jones, Attorney General; Jennifer L. Guiliano, Assistant Attorney General, on brief), for appellee.

**MEMORANDUM OPINION BY
JUDGE KEVIN M. DUFFAN**

Appealing his malicious wounding and child abuse convictions under Code § 18.2-51.2 and Code § 18.2-371.1, respectively, Andrew Ralph Fokas, Jr., argues that the Commonwealth failed to produce evidence that he "intentionally" caused his stepson's injuries. We disagree and affirm the trial court's judgment.[1]

## BACKGROUND

"We recite the facts in the light most favorable to the Commonwealth, the prevailing party below." *Johnson v. Commonwealth*, 85 Va. App. 257, 266 (2025) (quoting *Camann v.*

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Having examined the briefs and record in this case, the panel unanimously agrees that oral argument is unnecessary because "the dispositive issue or issues have been authoritatively decided, and the appellant has not argued that the case law should be overturned, extended, modified, or reversed." *See* Code § 17.1-403(ii)(b); Rule 5A:27(b).

*Commonwealth*, 79 Va. App. 427, 431 (2024) (en banc)). "Doing so requires that we 'discard' the defendant's evidence when it conflicts with the Commonwealth's evidence, 'regard as true all the credible evidence favorable to the Commonwealth,' and read 'all fair inferences' in the Commonwealth's favor." *Id.* (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)).

In June 2024, Fokas, his wife Jennifer Fokas—who was away completing a jail sentence—and two of her children lived together in Franklin County. One of the children, N.T., had recently turned two.[2] Fokas's mother, Lucinda Marie Girardi, lived next door. Later in June, after Jennifer completed her jail sentence and returned home, Girardi took care of N.T. for the weekend so that Fokas and Jennifer could spend time together. While she was caring for N.T., she noticed various small bruises around his knees, cheekbone, elbows, and chin. At the end of the weekend, Girardi returned N.T. to Fokas and Jennifer and left Franklin County for a trip.

On June 26, while Jennifer was at work and Girardi was away on the trip, Fokas called the Franklin County emergency dispatch and reported that N.T. was "having trouble breathing," was in and out of consciousness, and was gasping for air. While on the line, Fokas told the emergency operator that N.T. had been playing and their dog tripped N.T. Fokas later stated that the dog had tripped himself and N.T.

Officers arrived and quickly began to revive N.T. They also radioed the Department of Social Services (DSS). A physical assessment performed by paramedics found that N.T. had "bruising all over the body, face, extremities, chest, [and] legs, and . . . also found some softening to the back of his skull as well."

N.T. arrived at the hospital and was seen by a forensic nurse examiner (FNE), Melissa Miller, and then had emergency abdominal surgery. After the investigation following N.T.'s

_____

[2] We refer to the victim by his initials to protect his privacy.

hospitalization, Fokas was charged with malicious wounding and child abuse resulting in serious injury.

At trial, two medical professionals testified for the Commonwealth: Dr. Terri Wattsman, the attending surgeon, and Melissa Miller, the forensic nurse examiner who examined N.T. at the hospital. Dr. Wattsman was qualified as an expert in "general surgery, pediatric treatment and surgery, and emergency trauma care," while FNE Miller was qualified as a "forensic nurse examiner expert with experience in the field of pediatrics." Jennifer Coffey (N.T.'s foster mother), Girardi, and a forensic toxicologist also testified for the Commonwealth.

Dr. Wattsman testified that N.T. arrived at the emergency room with an "incredible number of bruises on his entire body," that tests showed he had blood in his urine, that x-rays displayed multiple rib fractures—all different ages—on both sides of his chest, that he had a tear in his mesentery, and that he had two injuries to his small intestine. His injuries were the result of "major trauma," and many were "life threatening." Dr. Wattsman opined that the variation and spread of the injuries suggested more than "one blow," and noted that even in the most serious accidents, injuries are less dispersed than those N.T. had. She then explained that while she could not say exactly where the injuries came from, she noted that they were from a blow— like a punch, a kick, or being thrown against an object—and probably multiple blows. She concluded that N.T.'s injuries were the result of "non-accidental trauma," which, as a medical term, "specifically means . . . intentional harm or injury to a child [inflicted by a caregiver]."

Similarly, FNE Miller testified that N.T. arrived at the emergency department with "bruises [on] pretty much the entirety of his body, his face, his torso, [and] his legs." She proceeded to document N.T.'s injuries on flowsheets and took photographs highlighting the wide range of N.T.'s injuries. At the end of her investigation, she concluded that N.T. "had suffered non-accidental trauma." FNE Miller ruled out other causes of injuries.

Girardi testified that the bruises on N.T.'s abdomen, sides, and back were new and that she would have noticed them had they been there when she took care of him a few days earlier. The Commonwealth admitted a transcript of her interview with investigators. In that interview she explained that the bruises were caused by "[s]omeone not being nice to [N.T.]." Girardi added that while Fokas had told her N.T.'s injuries stemmed from him falling on the dog, she did not believe him. She also remembered confronting Fokas about N.T.'s bruises before June 26, telling him that "this child looks hit."

Jennifer Coffey, N.T.'s foster parent, testified that since N.T. has been in her care, he has not had similar bruises.

Also during trial, the Commonwealth submitted a toxicology report, which was admitted through a forensic toxicologist, that explained that Fokas's blood samples had fentanyl, xylazine, despropionyl fentanyl, and methadone. The forensic toxicologist explained that the "high [f]entanyl concentration" found in Fokas's blood could have led to "mental clouding and confusion, slowed fine motor skills and reaction times, and difficulty with coordination."

At the close of the Commonwealth's case in chief, Fokas made a motion to strike the evidence, arguing that the Commonwealth failed to prove he intentionally harmed N.T. The circuit court denied the motion.

Fokas testified in his defense and stated that after changing N.T.'s diaper, he put N.T. on the floor and walked into another room to get N.T. juice. N.T. followed Fokas out of the room and into the hall. Fokas stated he was in a rush to pick up Jennifer, and that when he turned around to light his cigarette, the dog came out from under the couch and tripped him. He then testified that he fell on N.T. Fokas then testified that he "panicked" and shook N.T., stuck him under cold water, and tried to wake him up. After 20 or 30 seconds of "giving chest compressions and working on him" Fokas stated that he called 911. On cross-examination,

Fokas stated he used fentanyl on June 24—two days before the incident. Fokas stated that his whole body fell on "every part" of N.T.

Fokas was convicted by the jury of aggravated malicious wounding and child abuse or neglect resulting in serious injury. Following the convictions, the circuit court sentenced Fokas to 45 years' incarceration but suspended 27 years of the sentence. Fokas appeals.

ANALYSIS

On appeal, Fokas argues that the evidence was not sufficient to convict because there was "no direct evidence" that he "intentionally" caused N.T.'s injuries and that "any proof" he intended to harm N.T. is "merely circumstantial and speculative." We disagree.

When analyzing the sufficiency of the evidence in a conviction, an appellate court's role is "limited," and "[t]he only relevant question is . . . whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Commonwealth v. Wilkerson*, 304 Va. 92, 100 (2025) (alterations in original) (quoting *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024)). Under this analysis, if "the evidence and the supporting inferences are 'sufficient to support the conviction'" our inquiry ends as we are "not permitted to substitute [our] own judgment for that of the trier of fact, even if [our] opinion might differ from the conclusions reached by the trier of fact." *Garrick*, 303 Va. at 182 (quoting *Jordan v. Commonwealth*, 286 Va. 153, 156-57 (2013)).

"The sufficiency analysis 'does not distinguish between direct and circumstantial evidence, as the fact finder itself "is entitled to consider all of the evidence, without distinction, in reaching its determination.""" *Walker v. Commonwealth*, 79 Va. App. 737, 743 (2024) (quoting *Bagley v. Commonwealth*, 73 Va. App. 1, 26-27 (2021)). Indeed, as long as "the circumstantial evidence is sufficiently convincing to exclude every reasonable hypothesis except that of guilt," it is "competent and entitled to as much weight as direct evidence." *Id.* at

- 5 -

743-44 (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). Additionally, "[c]ircumstantial evidence is not viewed in isolation. 'While no single piece of evidence may be sufficient, the "combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion."'" *Commonwealth v. Hudson*, 265 Va. 505, 514 (2003) (quoting *Derr v. Commonwealth*, 242 Va. 413, 425 (1991)).

As Fokas was convicted of both malicious wounding and child abuse resulting in serious injury, we analyze each conviction in turn.

## I. Malicious Wounding

Under Virginia's malicious wounding statute, Code § 18.2-51.2, any person that "maliciously . . . wounds any other person, or by any means causes bodily injury, with the intent to maim, disfigure, disable or kill," is guilty of a Class 2 felony "if the victim is thereby severely injured and is caused to suffer permanent and significant physical impairment." At issue here is the statute's intent requirement which requires the offender to act "maliciously." *Id.*

"Whether or not an accused acted with malice is generally a question of fact and may be proved by circumstantial evidence." *Canipe v. Commonwealth*, 25 Va. App. 629, 642 (1997). "Malice inheres in the doing of a wrongful act intentionally, or without just cause or excuse, or as a result of ill will. [Malicious intent to wound] may be directly evidenced by words, or inferred from acts and conduct which necessarily result in injury." *Ramos v. Commonwealth*, 71 Va. App. 150, 162 (2019) (alteration in original) (quoting *Burkeen v. Commonwealth*, 286 Va. 255, 259 (2013)).

Here, there is ample evidence—when taken in totality—to support Fokas's conviction. Dr. Wattsman and FNE Miller both testified that N.T.'s injuries appeared to result from "non-accidental trauma." As Dr. Wattsman explained, "non-accidental trauma" "means . . . intentional harm or injury to a child [inflicted by a caregiver]." Both witnesses explained that the sheer

number of injuries and their dispersed nature likely ruled out Fokas's hypothesis that they were caused by a fall on N.T. after being tripped by their dog and that he further injured N.T. while administering CPR. Indeed, when Fokas's counsel asked Dr. Wattsman whether N.T.'s injuries could have been caused by "the full force of a [200] pound man landing on [N.T.]," Dr. Wattsman explained that while the impact "may cause injury" it probably would not result in "five different hematomas, a tear in the mesentery, [and] two small bowel injuries" all in different parts of the abdomen. Dr. Wattsman added that even in accidents where children are ejected from a car, the injuries tend to be more concentrated. Dr. Wattsman thought that multiple blows like "a punch, a blow, a kick, [or] throwing [the] child against something" were more likely.

Taken in totality, all the evidence was sufficient to "lead a reasonable mind irresistibly to a conclusion": that Fokas physically abused the two-year-old child he was supposed to care for. *Hudson*, 265 Va. at 514 (quoting *Derr*, 242 Va. at 425). Consequently, we cannot say the jury was plainly wrong in finding that Fokas acted maliciously and we affirm his conviction.

## II. Child Abuse

Under Code § 18.2-371.1(A), a parent is guilty of a felony if he or she, "by willful act or willful omission or refusal to provide any necessary care for the child's health[,] causes or permits serious injury to the life or health of such child." Notably, the statute requires a willful act or omission. *Id.*

The law surrounding willfulness is well established and clear. "An act is willful if it is intentional, purposeful, or involves a reckless disregard that injury will probably result from it." *Justice v. Commonwealth*, 82 Va. App. 237, 246 (2024). "Willfulness is synonymous with criminal negligence or recklessness and is judged under an objective standard that asks

whether the actor 'knew or should have known the probable results' of her acts." *Id.* (quoting *Miller v. Commonwealth*, 64 Va. App. 527, 544 (2015)).

Importantly, acting willfully is a central element of malice because a malicious act "describes a wrongful act done 'willfully or purposefully.'" *Bryant v. Commonwealth*, 295 Va. 302, 309 (2018) (quoting *Essex v. Commonwealth*, 228 Va. 273, 280 (1984)).

Because the jury found that Fokas acted with malice—and that conviction survives on appeal—the evidence was, also, necessarily sufficient to prove Fokas acted willfully. *See id.* Indeed, the same testimony and physical evidence that supports the malicious wounding conviction supports the conclusion that Fokas willfully injured N.T. As a result, the jury was not plainly wrong in finding that Fokas willfully abused N.T.

CONCLUSION

Finding no basis to disturb the malicious wounding and child abuse convictions, we affirm Fokas's convictions.

*Affirmed.*